Dennis A. DICKSON, et al., Appellants,

v.

**SECRETARY OF DEFENSE,**
**et al., Appellees.**

Nos. 94–5190, 94–5227.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 6, 1995.

Decided Oct. 31, 1995.

Donald H. Smith, Washington, DC, argued the cause, for appellants. With him on the briefs were Ronald S. Flagg, Gershon M. Ratner, and David F. Addlestone. Joseph R. Guerra entered an appearance, for appellants.

R. Craig Lawrence, Assistant United States Attorney, argued the cause, for appellees. With him on the brief was Eric H. Holder, Jr., United States Attorney. Daniel F. Van Horn, John D. Bates, and Michael T. Ambrosino, Assistant United States Attorneys, entered appearances, for appellees.

Before: WALD, SILBERMAN, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge SILBERMAN.

WALD, Circuit Judge:

Appellants Dennis Dickson, Bobby Haire, and Edward Hodges seek reversal of the district court's dismissal of their petitions to review decisions by the Army Board for Correction of Military Records ("Board"), which had refused to waive the limitations period for applications for upgrades of their discharge classifications. Each of these Army veterans applied for an upgrade long after the three-year limitations period, and in each case, the Board found that a waiver did not meet the statutory standard of being "in the interest of justice." The district court granted the government's motion to dismiss in each case, on the grounds that the Board's decisions were not reviewable. We hold that the Board's waiver determinations are reviewable, and further, that in each of these cases, the determination that a waiver was not "in the interest of justice" was arbitrary and capricious because the Board failed to provide any adequate explanation for its con-

clusions. We therefore reverse the judgments of dismissal and instruct the district court to vacate the Board's decisions and remand the cases to the Board for further consideration.

## I. BACKGROUND

### A. *Statutory Framework*

The Army Board for Correction of Military Records is composed of civilians who evaluate former servicemembers' allegations of errors or injustices in their military records. This Board, as well as similar boards for the other branches of the armed services, derives its authority from 10 U.S.C. § 1552(a)(1),[1] which in relevant part provides:

> The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice.... [S]uch corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department.

The limitations period is set forth in 10 U.S.C. § 1552(b):

> No correction may be made under subsection (a)(1) unless the claimant or his heir or legal representative files a request for the correction within three years after he discovers the error or injustice. However, a board established under subsection (a)(1) may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice.

### B. *The Facts*

#### 1. *Dennis Dickson*

Dickson voluntarily enlisted in the Army in 1964, and after approximately nine months of service he was granted a two-week leave. Dickson was five days late in returning from leave, and was convicted by court-martial for this absence. After his release from the stockade, Dickson began to drink heavily. He was absent without leave on two more occasions, for which he was again convicted by court-martial. After these events, the Army began proceedings to discharge Dickson for inability to adapt to military life, leading to his discharge, in 1965, under "other than honorable conditions."

Nearly 20 years later, in 1984, Dickson applied to the Board for an upgrade of his discharge classification. He claimed that his discharge had been unjust because he was not counseled before signing the discharge papers. In addition, he claimed that the discharge was unduly harsh because his offenses were mitigated by personal and family problems, and that under current Army standards he would have received a more favorable discharge.

The Board denied Dickson's application. In its decision, the Board noted Dickson's contention that he would have received a more favorable discharge under today's standards, and recited some of the facts Dickson had alleged about his situation. The Board then stated that the alleged error or injustice "was, or with reasonable diligence should have been, discovered" on the date of his discharge. The Board's conclusion read:

> The subject application was not submitted within the time required. The applicant has not submitted, nor do the records contain, sufficient justification to establish that it would be in the interest of justice to excuse the failure to file within the time prescribed by law.

#### 2. *Bobby Haire*

Haire enlisted in the Army in 1949, received an honorable discharge after nearly 2½ years of service, and later reenlisted. During his second enlistment, while stationed in Germany, he requested leave to return home to deal with troubles involving his wife, but his request was not granted. Around that time, he began to drink heavily. Haire was convicted by summary court-martial of being drunk and absent without leave, and later convicted for unlawfully carrying a concealed weapon, for missing a bed check, and fighting. In 1955, after the court-martials, Haire received an "undesirable" discharge from the Army.

In 1986, more than 30 years after his discharge, Haire applied to the Board for an

---

**1.** The implementing regulations for § 1552 can be found at 32 C.F.R. § 581.3.

upgrade of his discharge classification. Haire's main argument was that he had only recently learned that the Army had changed its procedures for dealing with alcohol abuse, and that under current standards, he would have received counseling and treatment, and likely would not have received an undesirable discharge.

The Board issued a decision in which it noted Haire's contention that "in today's Army he would either receive treatment or a better discharge." The Board did not address the merits or relevancy of this contention, but instead determined that the "alleged error or injustice was, or with reasonable diligence should have been discovered" on the date of discharge, and concluded, as with Dickson:

> The subject application was not submitted within the time required. The applicant has not presented and the records do not contain sufficient justification to conclude that it would be in the interest of justice to excuse the failure to file within the time prescribed by law.

### 3. Edward Hodges

Hodges enlisted in the Army in 1954, and served in Korea. Upon returning to the United States, Hodges took a 30–day leave to see his fiancee, and during his visit they broke off their engagement. Hodges reported to duty in Kansas, but stayed drunk for most of the next several months. He was disciplined for minor offenses and later failed to report for duty. He pleaded guilty in a general court-martial for absence without leave and was subsequently discharged under "other than honorable conditions" in 1957.

In 1979, 22 years after his discharge, Hodges first inquired about changing his discharge classification. He finally completed his application to the Board in 1985. In his application, Hodges claimed that he "did not know a discharge upgrade was possible until recently." In addition, he submitted evidence of his personal problems and alcohol abuse.

The Board denied Hodges' application. In its opinion, the Board noted Hodges' contention that his discharge classification was "unduly harsh," but did not address the merits of this argument. The Board found that the alleged error or injustice "was, or with reasonable diligence should have been, discovered" on the date of his discharge. The Board further stated, in language virtually identical to that used for Haire and Dickson:

> The subject application was not submitted within the time required. The applicant has not presented, nor do the records contain, sufficient justification to establish that it would be in the interest of justice to excuse the failure to file within the time prescribed by law.

## II. DISCUSSION

### A. Reviewability of Board Waiver Decisions

■ The district court granted the government's motions to dismiss the petitions to review these Board determinations. See Dickson v. Secretary of Defense, No. 93–952, Mem.Op. (D.D.C. May 6, 1994) (Richey, J.) (Dickson and Haire) ("Mem.Op."); Hodges v. Secretary of Defense, No. 92–2426, Mem.Op. (D.D.C. June 24, 1994) (Harris, J.).[2] Specifically, the district court found that Board waiver determinations are not judicially reviewable. Relying in part on an earlier district court decision,[3] and rejecting a contrary district court decision,[4] the court found that the language of § 1552(b) indicates that this statute confers exclusive discretion on the Board to make waiver determinations. See Mem.Op. at 10–11. The question of the re-

---

**2.** Judge Harris reached the same conclusions as Judge Richey, citing with approval his Memorandum Opinion. Our further references to the district court's opinion will be to Judge Richey's opinion.

**3.** Ortiz v. Secretary of Defense, 842 F.Supp. 7, 12 (D.D.C.1993) (waiver determinations completely committed to agency discretion, and thus not

reviewable), rev'd on other grounds, 41 F.3d 738 (D.C.Cir.1994).

**4.** Allen v. Card, 799 F.Supp. 158 (D.D.C.1992) (waiver determinations reviewable under an abuse of discretion standard), rev'd on other grounds sub nom. Detweiler v. Pena, 38 F.3d 591 (D.C.Cir.1994).

viewability of Board waiver determinations is subject to *de novo* review on appeal.

The government argues that the district court was correct in finding that waiver determinations are not reviewable because they involve matters committed to agency discretion under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 701(a)(2). The statute granting waiver authority to the Board, the government argues, contains no judicially manageable standards against which a court may analyze the Board's exercise of discretion, and thus does not envision review. *See* 10 U.S.C. § 1552(b). In the alternative, the government argues that none of these decisions was arbitrary and capricious because petitioners waited from 20 to 30 years to seek relief, and did not provide adequate reasons for their delay.

This court has not previously decided whether waiver determinations of the Board are reviewable. *See Kendall v. Army Bd. for Correction of Military Records,* 996 F.2d 362, 366 (D.C.Cir.1993) ("Without considering the question of the District Court's jurisdiction to review the ABCMR's decisions that it was not in the interest of justice...."); *Baxter v. Claytor,* 652 F.2d 181, 186 (D.C.Cir. 1981) (waiver determination is "for the Board to make *in the first instance*" (emphasis supplied)).[5]

The starting point for our analysis is the APA, which provides that final agency actions are "subject to judicial review." 5 U.S.C. § 704.[6] The only statutory exceptions to this rule are if a particular statute "preclude[s] judicial review" or if "agency action is committed to agency discretion by law." *Id.* § 701(a)(1), (2). Here, no statute precludes judicial review, so the only question is whether § 1552 commits the waiver decision exclusively to agency discretion.

 The mere fact that a statute is silent on the issue of review is not controlling. To the contrary, we "begin with the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Acad. of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2135–36, 90 L.Ed.2d 623 (1986). Thus, "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Labs. v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967) (collecting cases).

 In finding that waiver determinations are not reviewable, the district court placed heavy weight on the fact that § 1552(b) says that the board "*may* excuse a failure to file," and not that it "shall" excuse a failure to file. *See* Mem.Op. at 8 (emphasis supplied). We find this reasoning unpersuasive. When a statute uses a permissive term such as "may" rather than a mandatory term such as "shall," this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show *deference* to the agency's determination. However, such language does not mean the matter is *committed* exclusively to agency discretion. *See Mulloy v. United States,* 398 U.S. 410, 414, 90 S.Ct. 1766, 1770, 26 L.Ed.2d 362 (1970) (statute providing that

---

**5.** The majority of our sister circuits that have been presented with challenges to waiver determinations have reviewed them, although none has squarely addressed the reviewability issue faced here. *See, e.g., Guerrero v. Stone,* 970 F.2d 626, 635 (9th Cir.1992) (Board's decision was "arbitrary, capricious and unsupported by substantial evidence"); *Evans v. Marsh,* 835 F.2d 609, 613 (5th Cir.1988) (finding no abuse of discretion); *Boruski v. United States,* 493 F.2d 301, 304 (2d Cir.) ("we do not find that the [Board] abused its discretion"), *app. dismissed and cert. denied,* 419 U.S. 808, 95 S.Ct. 20, 42 L.Ed.2d 34 (1974), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975). The Eighth Circuit, however, in *Ballenger v. Marsh,* 708 F.2d 349, 351 (8th Cir.1983), stated that the Army Board "had no obligation" to consider petition-er's untimely application, although it did not find explicitly that waiver determinations are committed to agency discretion, nor did it address in any way the applicability of the Administrative Procedure Act.

**6.** In this case, it is undisputed that the Board is an "agency" for purposes of the APA, which defines "agency" to include "each authority of the Government." 5 U.S.C. § 701(b)(1). The only exceptions pertaining to the military are for "military authority exercised in the field in time of war or in occupied territory," *id.* § 701(b)(1)(G), and "courts martial and military commissions," *id.* § 701(b)(1)(F), neither of which applies here. *Accord Guerrero v. Stone,* 970 F.2d at 628.

Selective Service boards "may reopen" draft classifications does not permit board to elect not to reopen classification where applicant has presented *prima facie* case for new classification); *Barlow v. Collins,* 397 U.S. 159, 165–66, 90 S.Ct. 832, 836–38, 25 L.Ed.2d 192 (1970) (statute authorizing Secretary of Agriculture to promulgate regulations "as he may deem proper" does not preclude judicial review); *Environmental Defense Fund v. Hardin,* 428 F.2d 1093, 1098 (D.C.Cir.1970) (intent to preclude judicial review "cannot be found in the mere fact that a statute is drafted in permissive rather than mandatory terms").[7]

In *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the Supreme Court held that when a Board reviews the merits of a former servicemember's application under § 1552(a)(1), the decision is subject to judicial review. *Id.* at 303, 103 S.Ct. at 2367 ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence."). It is instructive that *Chappell* held that Board decisions to correct or not correct a military record are reviewable despite the fact that § 1552(a)(1) provides that the Secretary "*may* correct any military record." 10 U.S.C. § 1552(a)(1) (emphasis supplied). We see no reason why the use of "may" in § 1552(b) should preclude review of waiver determinations when it does not preclude review of decisions on the merits under § 1552(a)(1).

The government goes on to argue that we should infer an intent to commit waiver determinations to agency discretion in light of the further language that a Board may excuse a failure to file only if "*it* finds it to be in the interest of justice." *Id.* § 1552(b) (emphasis supplied). We disagree. This court recently rejected a similar linguistic argument, albeit in a different statutory context, in *Marshall County Health Care Authority v. Shalala,* 988 F.2d 1221 (D.C.Cir. 1993). In that case, we noted that the government was placing too much weight on the fact that a statute governing medicare reimbursement allowed the Secretary to make such adjustments " 'as the Secretary deems appropriate,' " *id.* at 1223 (quoting 42 U.S.C. § 1395ww(d)(5)(C)(iii)), and determined that this language—seemingly a stronger delegation to the agency than the one involved here—did not commit the matter solely to agency discretion. We again find instructive the Supreme Court's holding in *Chappell* that decisions under § 1552(a)(1) are reviewable despite the fact that the language there provides that the Secretary may correct a military record when "*the Secretary* considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1) (emphasis supplied). Just as before, if this parallel language does not suffice to commit Board determinations on the merits entirely to the Board's discretion, we fail to see why it should be sufficient to do so in the case of waiver determinations.[8]

Nonetheless, the government suggests that *Chappell* and other reviewability cases are of limited precedential value in light of the Supreme Court's later decisions in *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), and *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714

---

7. Indeed, taken to the extreme, this construction would mean that even if the Board expressly found in a particular case that it was in "the interest of justice" to grant a waiver, it could still decline to do so. *Cf. Mullen v. United States,* 17 Cl.Ct. 578, 582 (1989) (reading "may" in § 1552(b) to mean "shall").

8. We do not have here a case where an agency is given unfettered and standardless discretion. *Cf. Sargisson v. United States,* 913 F.2d 918, 921 (Fed.Cir.1990) (statute permitting release of military reserve officers from active duty "at any time" placed no substantive or procedural limitations on Secretary's discretion). Instead, the situation here is more akin to those cases in which courts have reviewed waiver denials despite statutory language providing substantial agency discretion. *See, e.g., Varela–Blanco v. INS,* 18 F.3d 584, 587 (8th Cir.1994) (decision by Board of Immigration Appeals not to waive deportation proceedings under 8 U.S.C. § 1182(c) is discretionary, but nonetheless judicially reviewable, despite the fact that the statute allows the waiver decision to be made "in the discretion of the Attorney General"); *see also Kent v. Johnson,* 821 F.2d 1220, 1223 (6th Cir.1987) (failure of inmate to file timely objections to magistrate's report would be waived in the interest of justice, due both to the inmate's proffered reasons for delay as well as the "considerable import" of the issue presented).

(1985) (finding that the "committed to agency discretion" clause could apply in both national security and agency enforcement situations). We have, however, already found that *Webster* did not alter *Chappell*'s holding that Board decisions on the merits under § 1552(a) are reviewable. *See Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1513–14 (D.C.Cir.1989).

In *Webster*, the statute at issue—the National Security Act—authorized the Director of the Central Intelligence Agency ("CIA") to terminate an employee " 'whenever [he] shall deem such termination necessary or advisable in the interests of the United States.' " 486 U.S. at 600, 108 S.Ct. at 2052 (quoting 50 U.S.C. § 403(c)). The Supreme Court observed that Congress (through the National Security Act) gave the CIA responsibility for "protecting intelligence sources and methods from disclosure," and noted that "the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees." *Id.* at 601, 108 S.Ct. at 2052–53. The *Webster* decision thus "turned in part upon the context in which the statutory mandate operated." *Kreis*, 866 F.2d at 1513. We found, however, that the parallels between the National Security Act and § 1552 were not strong enough to justify extending *Webster*'s limitation on review to Board decisions. For one thing, the language authorizing the Secretary to correct an "error" or "injustice" is "considerably narrower" than the CIA Director's broad directive to determine whether an employee's termination is "necessary or advisable in the interests of the United States." *Id.* at 1514. Moreover, we noted that in the case of Correction Boards, the Secretary of Defense "does not claim that national security concerns would constrain him in explaining his refusal to correct an error or injustice." *Id.* In contrast, the CIA Director might "legitimately find a termination warranted for reasons that cannot safely be shared with anyone outside the Agency." *Id.* Thus, we found that the National Security Act was substantially differ-

ent than the statute authorizing the Correction Boards, and that the normal presumption of review should not be abandoned.

We similarly find that *Webster* does not foreclose review of waiver determinations under § 1552(b). Just as in *Kreis*, the government here offers no reason why, in the legitimate interests of national security, the Board should not disclose the reasons for its decisions. While the efficient operation of the Armed Services is, of course, important to national security, the government does not argue here that adjusting the discharge status of a *former* member of the armed services is a decision so imbued with national security concerns as to require bypassing regular review procedures. Surely waiver determinations can implicate no more serious national security concerns than the substantive decisions involving the record corrections themselves.[9]

Moreover, we find *Heckler v. Chaney*, on which the district court principally relied, *see* Mem.Op. at 6, inapposite in this case. *Heckler* held that the Food and Drug Administration's decision not to take *enforcement actions* to prevent the use of drugs in lethal injections was not subject to judicial review. Because review by the Board is not an enforcement decision, *Heckler* is not persuasive here. Moreover, in rejecting the presumption that review is available for enforcement decisions, *Heckler* noted that these decisions "often involve a complicated balancing of factors which are *peculiarly within [the agency's] expertise.*" 470 U.S. at 831, 105 S.Ct. at 1655 (emphasis supplied). Here, we have been shown no sufficient reason why the determination, on a case-by-case basis, of what is "in the interest of justice" lies within the exclusive expertise of the Board. Courts have, in other contexts, found "in the interest of justice" to be a reviewable standard. *See, e.g., Sims v. Department of the Navy*, 711 F.2d 1578, 1581–83 (Fed.Cir.1983) (reviewing and upholding denial of attorney's fees by Merit Systems Protection Board, where

9. The basic decision by Congress to place discharge correction decisions outside the military chain of command and in the hands of civilians, *see* 10 U.S.C. § 1552(a)(1), further suggests that

they are not the sort of military decisions that are vital to national security and considered inappropriate for judicial review.

Board "may" direct payment of such fees if warranted "in the interest of justice").[10]

■ In sum, neither the language of § 1552(b) nor the statutory scheme in which it is embedded provide "persuasive reason to believe" that Congress intended that waiver determinations be committed solely to agency discretion.[11] *See Abbott Labs.*, 387 U.S. at 140, 87 S.Ct. at 1510. We therefore hold that Board waiver determinations under § 1552(b) are subject to judicial review.

**B.** *The Board's Decisions Here*

■ Having determined that the Board's decisions are reviewable, we now turn to the issue of whether the decisions here were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." .5 U.S.C. § 706.[12] Because the Board failed to provide anything approaching a reasoned explanation for its decisions, we hold that the waiver determinations were arbitrary and capricious.

■ "The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately

explain its result." *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C.Cir.1993); *Federal Election Comm'n v. Rose*, 806 F.2d 1081, 1088 (D.C.Cir.1986). The arbitrary and capricious standard of the APA "mandat[es] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579 (1990).

■ This does not mean that an agency's decision must be a model of analytic precision to survive a challenge. A reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Motor Freight System*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *see also International Longshoremen's Ass'n v. National Mediation Bd.*, 870 F.2d 733, 735 (D.C.Cir.1989). However, an agency's explanation must minimally contain "a rational connection between the facts found and the choice made." *Motor Vehicle*

---

10. In addition, we note that the situation here is readily distinguishable from our decision in *Falkowski v. EEOC*, 783 F.2d 252 (D.C.Cir.), *cert. denied*, 478 U.S. 1014, 106 S.Ct. 3319, 92 L.Ed.2d 727 (1986). In *Falkowski*, we found that a statute authorizing the Attorney General to send a lawyer into court " 'to attend to the interests of the United States' " was unreviewable. *See id.* at 253 (quoting 28 U.S.C. § 517). In reaching this conclusion, we relied on the extreme breadth of this charge, as well as the "lengthy history" of the discretionary authority of the Attorney General in determining whether to provide counsel for a federal employee. *Id.* In addition, *Falkowski*, like *Heckler*, involved a situation where a government office was being asked to balance its limited resources against its determination of broad interests.

In contrast, there is no history of total deference to the Board in the situations before us. *See Chappell*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (Board decisions on the merits are reviewable). Moreover, a waiver determination by the Board potentially involves only a minimal allocation of limited resources. *Cf. American Medical Association v. Reno*, 57 F.3d 1129, 1135 (D.C.Cir.1995) (Drug Enforcement Agency decision to increase registration fees under Controlled Substances Act subject to judicial review where resource allocation was not at issue).

11. *See generally* John Field, *Waiving the Discretionary Statute of Limitations Governing Boards for Correction of Military Records*, 62 Geo. Wash.L.Rev. 920, 932 (1994) ("Both the statute's legislative history and the overall legislative scheme strongly indicate that Congress did not intend to confer unlimited and unreviewable discretion [in the case of waivers] upon the Secretary.").

As to the burden that our dissenting colleague predicts will be imposed by judicial review on the agency to articulate its standards for waiver, *see* Op. at 1408–09, this is a burden which the agency is free to discharge either through case-by-case definition or by more general rule-like standards. It is a burden that other agencies have successfully discharged since time immemorial (or at least since the advent of the Administrative Procedure Act); our colleague's dire speculation that it will decrease rather than increase service-persons' chances for a break is just that—pure speculation.

12. The APA does not require that a statute explicitly provide for judicial review or articulate a standard of review. *Cf.* Mem.Op. at 8–9. Rather, the APA provides a default standard of judicial review—arbitrary and capricious—precisely for situations, such as this one, where a statute does not otherwise provide a standard of judicial review.

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (citing *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)).

■ Here, the boilerplate language used by the Board makes it impossible to discern the Board's "path." All three petitioners had alcohol-related problems which contributed to their discharges, and thus had some reason to hope that the Army's current, more favorable, standards for dealing with alcoholism might justify an upgrade in their status.[13] Although the Board in each case briefly recited the facts alleged by petitioners, and then found that a waiver would not be in the interest of justice, it omitted the critical step—connecting the facts to the conclusion. When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision.

■ Significantly, the Board's decisions do not reveal whether it relied exclusively on the legitimacy of the applicants' *reasons for delay,* or whether it also considered the *underlying merits* of their claims. Other courts have found that a determination "in the interest of justice" should not focus exclusively on the applicant's reasons for delay,

but should also go to the merits of his claim. *See, e.g., Guerrero v. Stone,* 970 F.2d 626 (9th Cir.1992).[14] In addition, the Board did not explain how it reached its conclusion about *when* the injustice should have been discovered.[15] Where, as in these cases, an applicant is arguing that he is entitled to an upgrade based on changed conditions for the treatment of alcoholism or other personal problems, the date he "should have discovered" the injustice may be the effective date of the new standard and not the date of his discharge. *Cf. Baxter v. Claytor,* 652 F.2d at 186 (on remand Board should consider whether appellant should have "discovered" the alleged error or injustice at the time of his court-martials in 1955 and 1956 or whether the proper date of discovery was 1972 or 1973, when subsequent Supreme Court decisions called into question whether appellant had a constitutional right to counsel at his court-martials). The Board's decisions here do not reflect whether it even considered this argument, much less what weight it deserved.

■ We emphasize here, as we did in *Kreis,* that in conducting this review we are attempting to identify whether "the decision making process was deficient, not whether [the] decision was correct." 866 F.2d at 1511.[16] But we cannot determine whether

---

13. Under the regulations that govern the closely related military Discharge Review Boards (but not the Correction Boards) a service member's discharge should be upgraded if there is "substantial doubt" he would have received the same discharge under current procedures and policies. 32 C.F.R. § 70.9(c)(1). *See generally Blassingame v. Secretary of the Navy,* 811 F.2d 65, 66–67 (2d Cir.1987) (discharge review boards provide an alternative means for correction of military records, but request for review must be made within 15 years of date of discharge, without possibility of waiver). Although we do not rule here on whether the Board must take into account new standards for the treatment of alcoholism, we note that the Board has failed to indicate in any way its view of the relevancy of these new standards.

14. Although we do not decide here the parameters of the "interest of justice" standard, we note that the Army Board has, at least in the past, considered the *merits* of an applicant's request as well as the *reasons for delay* in making waiver determinations. *See* H.R.Rep. No. 1825, 89th Cong., 2d Sess. 3–4 (1966) (letter from Secretary

of the Army). Under such a practice, an applicant with a worthy case on the merits might meet the conditions for a waiver even without a showing of a compelling reason for delay.

15. In each case, the Board concluded that "the alleged error or injustice was, or with reasonable diligence should have been discovered" on the date of discharge from the Army.

16. The government spends considerable effort attempting to justify the Board's decisions, arguing that the reasons for delay offered by petitioners were conclusory and vague. Such arguments are of no avail at this stage of the process. A reviewing court "may not supply a reasoned basis for the agency's decision that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). Thus, even if the government's arguments had merit—a question we do not reach—we could not uphold the Board's decisions where it did not address those arguments in its decision.

the decision making process was deficient until we are allowed to understand what that process was.[17]

Our dissenting colleague, however, suggests our prior decision in *Kendall v. Army Board for Correction of Military Records*, 996 F.2d 362 (D.C.Cir.1993), is controlling precedent that the Board need not explain its waiver denials. *See* Op. at 1408. This reading burdens *Kendall* with a weight far greater than it can bear.

Mr. Kendall was dishonorably discharged in 1975, following a court-martial for assaulting a fellow soldier. From the district court he sought review both of his court-martial and of the refusal of the Army Board for Correction of Military Records to consider his record correction claims, filed twelve years after his discharge. On appeal, we affirmed the district court's determination that Kendall's appeal from the court-martial was barred by the six-year statute of limitations of 28 U.S.C. § 2401(a). Without deciding whether the Board's refusal to waive the three-year limitation of 10 U.S.C. § 1552 was reviewable at all, we found that

> the substance of Kendall's claim lacks merit. If the ABCMR's decision is reviewable at all, the applicable standard of review is "whether [the] action of [the] military agency conforms to the law, or is instead arbitrary, capricious or contrary to the statutes and regulations governing that agency." Neither appellant nor *amicus curiae* have presented sufficient evidence to demonstrate that the ABCMR was arbitrary or capricious in holding that Kendall had failed to present sufficient evidence to show it was in the interest of justice to excuse his failure timely to file his appeal.... Kendall was required by 10

U.S.C. § 1552(b) to apply to the ABCMR for correction of his military records by November 4, 1978, or to demonstrate that the failure should be excused in the interest of justice. As appellant offered no evidence to the ABCMR to explain his delay, we cannot say that the ABCMR was arbitrary and capricious.

*Id.* at 366–67 (internal citations omitted).

Because it declined to decide whether the Board's waiver decision was reviewable at all, it appears that the *Kendall* court never considered the requirement of the Administrative Procedure Act that an agency explain its results. Had *Kendall* considered the issue of what kind of explanation the Board must give in waiver cases, the panel would surely have had to address, and distinguish, the many Supreme Court cases and D.C.Circuit cases requiring reasoned explanations from administrative agencies.[18] *See, e.g., Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579 (1990); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962); *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C.Cir.1993); *International Longshoremen's Ass'n v. National Mediation Bd.*, 870 F.2d 733, 735 (D.C.Cir.1989); *Federal Election Comm'n v. Rose*, 806 F.2d 1081, 1088 (D.C.Cir.1986). The *Kendall* court's brief discussion, however, mentions none of these cases, and appears to focus exclusively on the evidentiary sufficiency of the record before the Board to sustain its conclusion. *See* 996 F.2d at 367 ("the substance of Kendall's claim lacks merit"). Consequently, we cannot see how *Kendall's* holding that, "[a]s appellant offered no evidence to the ABCMR

---

17. Our dissenting colleague cites several cases for the maxim that courts give great deference to agency waiver determinations, *see* Op. at 1408, and we agree that the same would be true for these Board determinations. But deferential review is not the same as no review at all. Review of waivers helps ensure that a second tier of "secret law" absolving some but not others from the rigors of the statute does not impugn the equality of the principal law which does receive the benefit of judicial review. As Judge Leventhal so aptly observed more than two decades ago, "The agency may not act out of unbridled discretion or whim in granting waivers any more than in any other aspect of its regulatory function." *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C.Cir.1969). To conduct even a limited review, we must be made privy to the Board's reasoning.

18. As we have previously noted, "the very premise of appellate review is that reasoning matters." *United States v. North*, 910 F.2d 843, 881 (D.C.Cir.1990), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

to explain his delay, we cannot say that the ABCMR was arbitrary or capricious," can bind all future panels as to the need for an adequate Board explanation of its rationale. Now that we have decided waiver decisions *are* reviewable, it would be anomalous indeed to find ourselves bound by an interpretation of the *Kendall* decision, never articulated, that the Board, unlike all other administrative agencies, does not have to meet the ordinary requirements of the APA as to explanation of its reasoning. *Cf. Gersman v. Group Health Ass'n,* 975 F.2d 886, 897 (D.C.Cir.1992) ("Binding circuit law comes only from the holdings of a prior panel, not from its dicta."), *cert. denied,* — U.S. —, 114 S.Ct. 1642, 128 L.Ed.2d 363 (1994). We do not believe such an interpretation of *Kendall* is warranted or wise.

■ In sum, we find that the conclusory statements of the Board in these cases do not meet the requirement that "the agency adequately explain its result." *Public Citizen,* 988 F.2d at 197. Because the Board only listed the facts and stated its conclusions, but did not connect them in any rational way, the Board's decisions are arbitrary and capricious.[19] Where an agency "has failed ... to explain the path it has taken, we have no choice but to remand for a reasoned explanation." *Tex Tin Corp. v. EPA,* 935 F.2d 1321, 1324 (D.C.Cir.1991).[20] Accordingly, in each of these cases, the district court is instructed to vacate its own judgment of dismissal, vacate the decision of the Board, and remand the case to the Board for further consideration consistent with this opinion.

*So ordered.*

SILBERMAN, Circuit Judge, concurring in part and dissenting in part:

Reluctantly, I agree with the majority that judicial review is available, but remanding this back to the Board is contrary to the law of this circuit.

A string of Supreme Court decisions, which have created and nourished the artificial presumption that Congress intends judicial review of agency action, gives any petitioner an enormous leg up. *See, e.g., Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986); *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857–58, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820–821, 28 L.Ed.2d 136 (1971); *Barlow v. Collins,* 397 U.S. 159, 166–167, 90 S.Ct. 832, 837–838, 25 L.Ed.2d 192 (1970); *Abbott Lab. v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). (Public choice economists would surely point out that this presumption is more than a little self-serving.) And in *Kreis v. Secretary of Air Force,* 866 F.2d 1508 (D.C.Cir.1989), we held that substantive decisions of correction boards under § 1552(a) were reviewable notwithstanding a similar delegation to the Boards to make corrections when there was an "error or injustice." We did so relying on the Supreme Court's opinion in *Chappell*—which was most closely on point—but recognizing that *Chappell*'s logic was very much in tension with the later Supreme Court opinion in *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988).

I am not persuaded that the Congress, by using the term in § 1552(b) "in the interests of justice," contemplated judicial review. It is suggested that that standard is one peculiarly within the expertise of the judiciary.

**19.** Here, we have found that petitioners have clearly explained the merits of their claims. Dickson alleged he was not counseled before signing his discharge papers, that his offenses were mitigated by personal and family problems, and that under current standards he would have received a more favorable discharge. Haire similarly contended that under current standards he would have received counseling and treatment rather than an unfavorable discharge. And Hodges claimed he was only recently made aware of the possibility of an upgrade of his discharge status, and submitted evidence of his personal problems and alcohol abuse. Those contentions warrant more than a summary response.

**20.** In light of this disposition, we do not reach the issue of whether petitioners' equal protection rights were violated by the Secretary's actions. *See Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

But, the "interest of justice" standard, absent some principles drawn from a statute or particular body of law, is without determinable substantive content. At bottom, it is a phrase often, perhaps typically, used by judges in circumstances when they wish to impose their own will rather than apply the law. That is why Justice Holmes bristled when his friend Learned Hand, shouted out, as they were departing company, "Well, sir, good-bye. Do justice!" Holmes stopped and said "That is not my job. My job is to play the game according to the rules." HARRY C. SHRIVER, WHAT GUSTO: STORIES AND ANECDOTES ABOUT JUSTICE OLIVER WENDELL HOLMES 10 (1970). Nevertheless, having determined that actions under § 1552(a) are reviewable, I do not see how we can persuasively draw a distinction, based on congressional intent, between that section and § 1552(b). Still, to hold that the Board's refusal to grant a waiver is reviewable does not oblige us to remand to the Board for the explication of a "waiver policy" that the majority requires.

Even when judicial review is undeniable, we have traditionally afforded an agency determination whether to grant a waiver of a rule maximum deference. *City of Angels Broadcasting Inc. v. FCC,* 745 F.2d 656, 663 (D.C.Cir.1984); *Thomas Radio Co. v. FCC,* 716 F.2d 921, 924 (D.C.Cir.1983); *WAIT Radio v. FCC,* 459 F.2d 1203, 1207 (D.C.Cir.), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972). Judicial review of agency action has, as its core concern, the notion that agencies should treat the subjects of their authority equally. The prohibition against arbitrary and capricious action in the APA flows naturally out of the basic concept that ours is a government of laws not men. Thus, reviewing courts show little tolerance for rules that are fashioned to apply unequally. And, agencies are not permitted to adjudicate in such a fashion as to favor illogically one litigant over another. We, thus, force agencies to carefully explain deviations in course whether adopted in a regulatory or adjudicatory mode. On the other hand, we recognize that rules can have a harsh impact in unusual situations. When an agency waives its rules in a particular case, we will not typically hold the agency to a very exacting standard of explanation, recognizing that if we do we may make it practically impossible for the agency to grant any waivers.

Appellant's claim essentially is that the Army's policy toward alcoholism has changed over the many years since they were discharged and that they might be treated differently on the merits today than was so decades before. In this respect, they rely on a Ninth Circuit opinion, *Guerrero v. Stone,* 970 F.2d 626 (9th Cir.1992), suggesting (outrageously, it seems to me) that the Board *must* consider the merits of an ex-service member's claim when considering whether to grant a waiver for a late application. Appellants have not sought to show that the Army Board's denial of waivers in these cases is inconsistent with any previous actions of the Board. Appellants do not advance any plausible reason for having delayed beyond the three-year statute of limitations to file their request for corrections of records. This is true even if the three-year statute of limitations is construed as having started to run when the Army changed its policy in 1980.[1] In a quite similar case, which should be thought binding on this panel, we *held* that the Board's action was not arbitrary and capricious, without requiring any explanation of the Board. *Kendall v. Army Bd. for Correction of Military Records,* 996 F.2d 362, 366–367 (D.C.Cir.1993). The majority's opinion—demanding that the Army Board set forth a comprehensive explanation of its policy toward waiver—follows precisely the reasoning of the *dissent* in that case. *Id.* at 370–371.

To be sure, we will not typically accept an agency decision that is unaccompanied by an explanation adequate to permit us to understand the agency's reasoning. But a decision to grant or not to grant a waiver, which is subject to such deferential review, is in a different category. It is usually when we are faced with palpably inconsistent actions that an agency is obliged to explain. *See, e.g., Green Country Mobilephone v. FCC,* 765

---

1. Appellants argue that the Board's decision refusing to excuse applicants' failure to file within three years was illegal, *not* that they had filed within three years.

F.2d 235 (D.C.Cir.1985).[2] It seems clear to me that Congress intended the Board's waiver authority to be exercisable without such heavy-handed judicial supervision. This is an instance of an unfortunate trend in administrative law—building on the self-serving judicial review presumption—of allowing the judicial review tail to wag the administrative (and statutory) dog. Now the Department will have to go though the burden of spelling out those circumstances under which a waiver will be granted, cabining their discretion, so that we, the reviewing court, will be convenienced.

Ironically, the result will almost surely disadvantage veterans since it seems inevitable that on remand the Board will adopt standards for a waiver that will only focus on the reasons for delay—rather than the merits of the claim. That means perforce that some veterans, whose claims on the merits for some reason would have moved the hearts of the Board members, will not be able to get a waiver. This is just a small example of the pernicious effect of a judicial mind set, nourished by the prejudices of law professors and lawyers, that believes implicitly that as many decisions as possible in our society should be subordinated to judicial oversight.

---

**2.** Perhaps, if one of the appellants attempted to explain his delay in terms other than the merits of his claim the case might be different.